**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**
**Portland Division**

| | |
|---|---|
| **SETH T. CAREY,** ) | |
| ) | |
| **Plaintiff** ) | |
| **vs.** ) | |
| ) | |
| **MAINE STATE POLICE,** ) | |
| **RUMFORD POLICE DEPARTMENT,** ) | |
| **MICHAEL CHAVEZ,** ) | |
| *In his professional capacity* ) | |
| *as Maine State Police Detective* ) | |
| **DANIEL GARBARINI,** ) **Case #:** | |
| *In his professional  capacity* ) | |
| *as Rumford Police Detective,* ) | |
| **ROBERT C. GRANGER,** ) | |
| *In his professional  capacity* ) | |
| *as District Attorney of* ) | |
| *Hancock & Washington Counties* ) | |
| ) | |
| **Defendants** ) | |

**COMPLAINT AND JURY TRIAL DEMAND**

NOW COMES Plaintiff Seth Thomas Carey, ("Carey") in the above-entitled matter, and brings forth this complaint and also moves for a declaratory judgment against the Defendants, Maine State Police, ("MSP"), Rumford Police Department ("RPD"), Daniel Garbarini, ("Garbarini"), Michael Chavez, ("Chavez"), Robert C. Granger, ("Granger") and alleges as follows:

### **INTRODUCTION**

1.  Plaintiff Seth T. Carey was completely falsely accused, defamed and maliciously prosecuted by Defendants.

1

2.      As a result, he has lost his professional career- he has been effectively disbarred and his reputation ruined to the point that he cannot even get a job as a waiter.

3.      Plaintiff brings this action under the Liberty and Freedom Clauses of the United States and Maine Constitutions, and 42 U.S.C. § 1983, challenging Defendants' acts, orders, policies, practices, customs, and procedures, which deprived Plaintiffs of his liberty without justification.

4.      As set forth in this Complaint, the acts, orders, policies, practices, customs, and procedures of Defendants were the cause of, and the moving force behind, the constitutional violations in this case.

5.      Plaintiffs seek a judgment awarding damages and compensatory damages for the taking of Plaintiffs' liberty and freedom without just compensation.

6.      Plaintiffs also seek an award of their reasonable costs of litigation, including attorneys' fees and costs, pursuant to 42 U.S.C. §1988 and other applicable law.

7.      Plaintiff Seth Carey was investigated by the Defendant law enforcement agencies for very serious violent sex crimes that were obviously fabricated, falsified, nonsensical and ridiculous.

8.      This sham investigation went on for over three years, when suddenly Plaintiff was arrested at gunpoint by the US Marshalls while working in Florida.

9.      He spent 9 days in jail in Orange County, Florida having not much of an idea what he was even accused of, while knowing he never broke the law.

10.     He was told by his family that there was a big media blitz about him getting arrested for felony sex and violence crimes in Florida and being extradited back to Maine.

11. In fact, the Defendant Maine State Police put out a press release stating these very false sensationalized charges, based on no actual evidence.

12. The Defendants took an obvious false allegation of a seriously troubled live-in ex-girlfriend of Plaintiff who was just making up these allegations when she had nowhere else to go.

13. This "dog and pony show" put on by the MSP was an appalling display by perhaps the most widely-known corrupt agency in the state.

14. Defendant Michael Chavez is a detective for the MSP.

15. He came down to Florida with another officer on the backs of the Maine taxpayers and picked up Plaintiff from jail and brought him handcuffed through an airport and then on a plane handcuffed like a murderer.

**JURISDICTION, VENUE AND NATURE OF THE COMPLAINT**

16. This is an action to remedy and enjoin Defendants' tortious actions directed at Plaintiff Carey. The parties at all relevant times to this matter resided and/or conducted business in the State of Maine.

17. Defendants' wrongful and unlawful acts include multiple serious violations of Plaintiff's constitutional rights under the US and state constitutions.

18. Also, torts include defamation, negligence, negligent hiring, negligent supervision, NIED, IIED, malicious prosecution, invasion of privacy, violation of Maine Unfair Trade Practices Act, false light, intentional misrepresentation.

19. Plaintiff has proper jurisdiction over this matter as he complied with the notice provisions and requirements under the Maine Torts Claims Act in accordance with the provision of 14 M.R.S.A. §8107.  Mr. Carey filed a claim with the Defendants based on these injuries in accordance with the Maine Tort Claims Act.  More than six (6) months passed since he filed his MTCA claim with these entities.

3

20. This Court has subject matter jurisdiction under 28 USC § 1331, on the basis of there being a federal question relating to the U.S. Constitution. See <u>Bivens v. Six Unknown Narcotics Agents</u>, 403 U.S. 388 (1971).

21. This Court also has subject matter jurisdiction under 28 USC § 1331, on the basis of there being a federal question relating to 42 USC § 1983.

22. Venue is appropriate because Defendants all work and reside within the district boundaries for this Court.

23. Plaintiff Seth Carey is a Maine resident, residing in Rumford, Maine.

24. The MSP is a government law enforcement agency formed by the Maine government.

25. The RPD is a police force in Rumford, Maine, formed by the town of Rumford.

26. Daniel Garbarini is a captain with the RPD.

27. Michael Chavez is a detective for the MSP.

28. Robert C. Granger is the district attorney for Washington County that prosecuted the case against Plaintiff.

29. Venue is proper as all parties reside or are organized under the laws of the state of Maine.

30. Personal and subject matter jurisdiction is properly laid in the federal court based on Federal Questions.

31. The torts that Defendants are liable for include but are not limited to: malicious prosecution, negligence, negligent hiring and supervision, defamation, negligent and intentional infliction of emotional distress, conversion, theft of valuable property, false imprisonment, false light, invasion of privacy, violation of the Maine Unfair Trade Practices Act, criminal and civil fraud, loss of consortium, conversion, breach of duties of care, fiduciary duties, misfeasance, and monetary damages.

32. Tortfeasors maliciously arrested, prosecuted and criminally targeted their political opponent Claimant Seth Carey unconstitutional

4

discrimination against him, and violation of his rights under the Equal Protection Clause, including a federal 42 U.S.C. Section 1983 claim for false arrest.

33. Also included is a personal injury claim for a health injury for false imprisonment after spending ten days locked up in jail, falsely imprisoned under subhuman conditions.

34. Defendants were properly noticed under the Maine Torts Claims Act.

**SUMMARY OF CLAIMS**

35. Plaintiff Seth T. Carey was completely falsely accused, defamed and maliciously prosecuted by Defendants. As a result, he has lost his professional career as an attorney- he has been effectively de facto disbarred, and his reputation ruined to the point that he cannot even get a job as a waiter.

36. Defendants all played their part in a sham "investigation" of a known troubled woman in order to have an excuse to take his phone outside a courthouse, leaving no way to communicate with his clients and having no way to protect them from a creepy DA that admitted in court under oath he spent literally a month of the taxpayers' money looking through the phone.

37. Plaintiff then lost a thriving law practice instantly, was arrested at gunpoint by six US Marshalls, jailed for nine days with actual messed up criminals, extradited in chains by another corrupt skulk Defendant Detective Michael Chavez and falsely accused of horrific crimes in an intentionally dishonest sensationalized media "dog and pony show," all because he dared to run against the district attorney on a platform of stopping government corruption.

38. The Defendant State Police called for a news conference where they told the Maine media that they had arrested a serious criminal and thanked the Marshalls and their investigators in Florida.

5

39. It was all a charade.  They only asked for a $2000 bail.  If any of this bogus claim was true, bail would have been in the hundreds of thousands, if they allowed bail at all.

40. For many months Plaintiff Carey had the worry and anxiety of going to jail for crimes he did not commit.

41. These felony sex charges could have put Plaintiff in prison for over 10 years.

42. It was a media circus, all perpetuated and originated by the corrupt tortfeasors herein.

43. Plaintiff made it clear to the corrupt lead detectives of the Maine State Police- Chavez, and college dropout Det. Daniel Garbarini that he had nothing to hide and would talk to them freely about Tiffany Burlingame's obvious false claims after they had stolen Plaintiff's phone with a warrant acquired through obvious false claims.

44. Never did these incompetent and shady detectives discover anything different than what Plaintiff told them on that first day and all the follow-up calls he made to them to see if they were going to arrest the fake victim for making a false report.

45. Chavez led Carey on that he would do that.  Instead, after a three year "investigation," they had Plaintiff arrested at gun point by the US Marshall's office in Florida.

46. Carey painstakingly spent the next 10 days in jail in Orlando, having no criminal record and never spending time in jail.

47. After eating only disgusting ultra processed food not suitable for an animal for over a week, in jail he did not have one bowel movement.

48. Plaintiff, after being released from jail and eating nutritious fibrous foods again, he was finally able to have a bowel movement, but it was so painful and arduous, that it popped blood vessels, giving him hemorrhoids that he will likely always have for the rest of his life his doctor said.

49. Furthermore, the Rumford Police continue to discriminate against Plaintiff.

50. Defendant RPD refuses to enforce the law in Rumford Point where Plaintiff lives. This area is just as much part of Rumford as any other place in Rumford.

51. Specifically, despite numerous calls and letters over the last two years about criminal speeding all day and night in Rumford Point, the RPD has done literally nothing about these criminals.

52. It is to the point that speeders have zero fear of getting pulled over so they will go double or triple all day past Plaintiff's home where the posted limit is 30 mph and 25 mph past his house on the curve.

53. There have been a bevy of serious accidents right around his house due to speeding just in the last few months. A family of 5 went too fast around the curve and flew off the embankment and would have drowned in the river if a tree didn't stop their SUV.

54. A tractor trailer truck went too fast around the curve and flipped over, damaging property and a telephone pole and knocking out power. A crash in front of Plaintiff's home totaled two vehicles.

55. Instead of helping the police chief threatened to arrest Plaintiff and falsely accused him of being on bail conditions for their false arrest of him listed above.

56. The harassment has continued over and over with no end in sight. Anytime Plaintiff is victimized by the area populous of criminals, these people are never charged or held accountable. Just Carey.

57. He was recently charged with violating a PFH of a squatter who defrauded him to live in his building. Plaintiff simply put a court paper on her doorstep, as it was an expedited motion she needed to see immediately, and her lawyer said she was not representing her in that matter. Of course, the RPD summonsed Plaintiff.

58. Those charges were obviously dropped by the DA, but after many months.

59.   Then most recently Plaintiff was charged with disorderly conduct for asking a person that owed him money whether he was going to pay him.

60.   When will the harassment, false charges, discrimination and corruption end?  This is why Plaintiff is seeking injunctive relief.

61.   Plaintiff seeks significant monetary damages to compensate Plaintiff for the damage to his professional legal career, reputation in the community due to the actions of the Tortfeasors.

62.   This includes the value of seven years income as an attorney, and the value of damage to his reputation, both professionally and in the community.

63.   This also includes the psychological damage associated with continued harassment and discrimination, which has been explained in detail in numerous past legal notices.

64.   Defendants' illegal, arbitrary, wanton, capricious theft of Plaintiff's business cell phone and eventual false imprisonment, arrest and jailing was outrageous and detestable.

65.   Defendants through their actions deprived Mr. Carey of his constitutional right to liberty without due process of law in violation of the Fifth Amendment to the United States Constitution.

66.   Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.

67.   Defendants' conduct violated clearly established constitutional or other rights of which these Defendants knew, or of which a reasonable public official should have known.

68.   Defendants' actions, omissions, policies, patterns, practices, and customs, as complained of herein, were intentional and reckless and demonstrate a callous disregard for, or deliberate indifference to, Mr. Carey's personal safety, security, freedom, and civil and constitutional rights.

69. These violations are compensable under Maine and federal law.

70. As a direct and proximate result of the unlawful actions of these Defendants, Mr. Carey has suffered economic damages and significant physical and emotional harm.

**STATEMENT OF THE CASE**

71. The destruction of and career crucifixion of the Plaintiff Seth T. Carey, a professional attorney of over a decade, took place with a Protection From Abuse, ("PFA") hearing fittingly on Good Friday 2018.

72. That order resulted in embarrassment for Appellant, as he was running for District Attorney.  Amazingly, the state superior court affirmed the erroneous order of the district court, resulting in a "temporary" (8 month) suspension from the practice of law.

73. This suspension was based on no evidence, only the utter self-serving testimony of Plaintiff's "ex-girlfriend" Tiffany Burlingame

74. The same judge then heard Carey's trial for "permanent" suspension and proceeded to affirm his own misjudgment of MRPC violation.

75. Neither the district court that issued the PFA, nor the Superior Court sitting as the Law Court would allow itself to take testimony from multiple witnesses, view the 5 other PFA's that the "victim" had filed or had field against her, look at her criminal record, over 50 calls to the police, news articles on national media outlets chronicling her arrest for violently beating her ex-husband while he was driving then having her first child in the back of a police cruiser, her having all four of her children taken from her, messages regarding her fake suicides or view evidence that demonstrated very clearly the fake victim's lack of credibility, penchant for dishonesty mental instability and admissible bad character.

76. As the lower superior court, over objection, refused to admit the multiple affidavits of false victim's romantic partners explaining in excruciating detail the habit of fake victim's physical and mental

9

abuse of them and her penchant of filing false claims to gain advantage over them and others. Plaintiff's attorney still was able to offer them to the court as offers of proof.

77.    There were numerous instances throughout this trial which blatantly demonstrated the false victim's penchant for mistruths and lack of veracity. Furthermore, she demonstrated frequent obvious inconsistencies.

78.    Ms. Burlingame feebly attempted to state that the reason she sent photos of her partially nude in "thong" underwear and Plaintiffs Patriots jersey just a week before she filed her false PFA complaint, because she "sent them to him by mistake," (Transcript, 8/15/18, p. 178, #23-26) and (8/16/18, p. 141, #10-25).

79.    This was another obvious mistruth in a long line of mistruths for a person who is factually challenged. The truth is that Plaintiff did not show enough interest when she sent a photo of her face; Plaintiff responding with a simple, "nice."

80.    So, she "upped her game," by sending the thong photo, stating, "no, but this is," which was the selfie photo of Burlingame partially nude in Appellant's Patriots jersey, (Transcript, 8/16/18, p. 142, #10-17).

81.    In the end, the majority of Burlingame's false sworn statements in her PFA Complaint were soundly discredited.

82.    For instance: 1) She said she put a lock on the door of the room where she stored her belongings to "keep him from coming into my room at night."

83.    Yet it was proven she never slept in that room, (Transcript, 8/16/18, 187, #8). 2) "[H]e was my lawyer and now is using that to do whatever he wants to me.

84.    The alleged conduct, "did not arise in the course of a lawyer-client relationship." 3) "I have message proving everything." She never produced any proof of anything material.

10

85. The Defendants have all essentially conspired to ruin Plaintiff's career, all based on *total lies* of Tiffany Burlingame.

86. Burlingame made up an intricate set of lies hours before the deadline imposed for her to be out of his house.

87. She did this in the form of a Protection From Abuse ("PFA") filing in the Rumford District Court.

88. The final hearing on the matter took place four days later.

89. In that time before the hearing, Defendant Burlingame erased several conversations between her and the Plaintiff on Facebook.

90. After the hearing, Burlingame proceeded to erase a great deal of her Facebook "wall" on her page.

91. She erased anything that told the truth about what kind of person she is.

92. She erased anything that could be perceived as negative.

93. In doing so, she has violated the laws protecting litigants against spoliation of evidence.

94. These violations were done specifically to bolster and give credence to her lies focused on further damaging Plaintiff's career and possibly his freedom.

95. The modus operandi was simple: Burlingame's experience as a Defendant and Plaintiff in filing and have PFAs filed against her led her to abuse the PFA process by filing a PFA on Plaintiff in order to stay in his home for 6 weeks after he had told her she had to leave. Burlingame's destruction of critical evidence granted herself an unfair and illegal advantage both in her and her co-Defendants' illegitimate prosecution of Plaintiff, but also in the case at bar for civil damages.

## **FACTS**

In order to understand how preposterous it was for Defendants and the Board of Bar Overseers to accuse Plaintiff of abusing a disturbed likely sociopathic accuser, Plaintiff unfortunately believes it is vital for the Court

to see every bit of history that led up to him having a temporary protection from abuse order issued, then a two year order, then a temporary suspension from practice, then a three year, which is now seven year suspension, and lastly to be arrested at gunpoint by US Marshalls and thrown in jail, charged with a bevy of felonies, jailed for nine days and extradited to Maine to face trial, all based on no evidence.

96.    Fake victim Tiffany (Beaucage) Burlingame falsely accused Plaintiff Seth T. Carey of abusing her, by complaint for temporary protection from abuse, ("PFA") in the Rumford District Court on March 26, 2018.

97.    False alleged victim Burlingame filed her complaint before the noon deadline for her to move out of Plaintiff's house where she was a guest who overstayed her welcome.

98.    Alleged victim filed the complaint solely to take advantage of the PFA statute that allows an alleged victim to stay wherever she may be staying at the time if the alleged defendant lives there as well.

99.    A trial was held a mere four days later on the PFA complaint.  The trial court erred in not allowing any evidence of Plaintiff's reputation, motive, intent or common plan or scheme to use the PFA statute to stay in the alleged abuser's home by fabricating the allegations of abuse.

100.    In response to Plaintiff's repeated objections to the Court's denial of his admitting evidence and testimony of alleged victim's motive, intent or common plan or scheme, the Court stated that this evidence is inadmissible character evidence.

101.    As a result of the Court's multitude of errors of law and judgment, it found for the alleged victim and a two-year PFA order was issued.

102.    As Plaintiff was an attorney at the time, the Board of Overseers of the Bar a short time later filed paperwork to immediately suspend Plaintiff, which it accomplished based on this erroneous District Court ruling.

103. Plaintiff is now suspended from practicing law on an interim basis.

104. The Overseers are seeking a permanent disbarment based on the flawed and 100% erroneous finding of abuse by the trial court.

105. The lower court Judge made grave errors that have led to devastating consequences for Plaintiff.

106. Plaintiff is currently appealing this ruling and seeks justice and a remand of this matter back to the lower court in accordance with well-established legal precedence of this Court and almost all other courts across this country regarding the rules of evidence.

107. The District Court Judge abused his discretion in finding that Plaintiff had abused the alleged victim Burlingame, when it is obvious to anyone other than the Court that the fake victim made up her allegation of abuse simply to stay in Plaintiff's home when she was facing abrupt eviction with nowhere else to go.

108. Plaintiff is completely innocent of any unethical behavior and the trial court's confusion on the issue of guilt or innocence is clear error.

109. The Court lacked the insight and competence to understand what every lay person friend or "former" client has told Plaintiff; that it is obvious that the fake victim made this story up to stay in his house when she was asked to leave.

110. The Court severely limited Plaintiff from conducting his case within the Rules of Evidence.

111. Not allowing a great deal of exculpatory evidence to be presented by Plaintiff, the Court hamstrung Plaintiff to the point that he was unable to conduct the presentation of his case to the level necessary to show the Court the truth of the matter; that he did not abuse the alleged victim whatsoever, and she only fabricated her story in order to stay at his home by "winning" an abuse order when she had "no other options" regarding places to stay.

112.  Plaintiff was not permitted to demonstrate alleged victim's abuse of process in other PFA matters, nor evidence of her intent, motive, plan/scheme in filing the false PFA complaint.

113.  Ms. Burlingame was asked by Plaintiff to record a basketball game on his DVR 9 hours before the start of the game.  It was a March Madness game featuring his alma mater Clemson and top seeded Kansas.  It was important to Plaintiff to watch this game.

114.  Like he does many Friday nights in the winter, he was going night skiing during the game.  Burlingame said she had taped the game several hours before when Plaintiff reminded her to record it.  She stated she was playing pool out at a bar with her uncle that night.

115.  Burlingame destroyed much of the evidence in this case- Facebook messages between the parties and postings on her page- anything that would make her look bad and exonerate the Plaintiff.

116.  There is a Motion For Sanctions- Spoliation of Evidence that is about to be filed in this case against Defendants stemming from these false charges by Burlingame, perpetuated by Defendants.

117.  Although little was left for Facebook evidence, Plaintiff, after he was served with the PFA complaint went on his Facebook Messenger and took screenshots of all the messages between Burlingame and himself.

118.  These were then printed out and numbered, (T1-T29).  Plaintiff used these messages as his exhibits at the PFA hearing to show so obviously that there was no evidence of abuse in dozens of messages, (and Burlingame was given ample opportunity to supplement or refute any of the messages or provide any from her phone that were any different.

119.  Although all of Plaintiff's other proposed exhibits were denied by the court, these certain Facebook messages were all admitted.

120.  Instead of showing exactly what had taken place; simply the breakdown of a relationship, (whatever kind of relationship it had

been) the court totally confused the clear tenor of the conversation and somehow ruled that the messages confirmed his belief that Burlingame was telling the truth in alleging she was abused.

121.  Despite the trial court's grave and drastic error of judgment, the truth that should be obvious from the messages is that the owner of a house told a person who he had let stay there for a few months that they needed to talk about the guest not pulling her weight after he was so disappointed that he did not record a simple game that should have taken her less than a minute.

122.  The guest, (Ms. Burlingame) stated there was "no need to talk, (she) would leave."

123.  The owner of the house, (Plaintiff) was satisfied with her leaving, especially after she answered him back rudely instead of simply saying sorry and that she would give it more attention next time.

124.  The back and forth messages demonstrate clearly that this was an argument over the taping of a game and Plaintiff feeling disrespected.

125.  Burlingame did accuse Plaintiff of being fine with her leaving because, "I won't sleep with you anymore."

126.  This was a recent occurrence, (in the week or so before when Plaintiff interrupted a cozy moment between the parties in the living room to take a FaceTime video call from a woman he had been talking to.

127.  Jealous, at least in part, Burlingame said she wasn't going to sleep with Plaintiff if he was talking to another woman.

128.  This was strange, since Plaintiff had been told by multiple people that when Plaintiff was gone during the week she had several men in Plaintiff's house.

129.  She had called the police several times when she got in fights/arguments with them; Plaintiff found out after the PFA was filed.

130.  Those facts combined for Plaintiff to agree in a text argument late on a Friday night when he was sullen about missing his game that yes, her

having relationships with other men in his own house and playing mind games with Plaintiff about the situation, combined with her taking over his house and him having to clean up after her was an issue.

131. Somehow, the court took Burlingame's flippant random accusation and used it to back up his woefully misguided belief in the story of Burlingame, an unemployed, lazy person allegedly with an addiction to pain pills, allegedly a prostitute, who has had her four children taken away from her by the state and courts, who made Fox News for having a baby in the back of a police car after her arrest for beating up her ex-husband, and who has filed or had 5 PFAs filed against her in the Rumford District Court alone.

132. That person was believed based only on her perjured testimony instead of Plaintiff, a professional distinguished member of the community, section leader in his church choir for 25 years, with no history of violence, abuse or sexual impropriety.

133. Plaintiff is confident that the Law Court's examination of the record, transcript and these messages will glean the truth of the situation and vacate the trial court's abuse of discretion.

134. There is a long history of messages between the parties.  Again, solely by Burlingame's direction, most of those messages have been deleted by her.

135. Still, from even the weeks messages before that are available, it is obvious that Burlingame initiates flirty messages to Plaintiff.

136. Moreover, there is no evidence of any abuse or negativity in these messages.

137. For instance, on March 15, she called Plaintiff "blue eyes," March 21, 2018, at 11:43 pm Burlingame asked Plaintiff when he would be back.

138. He responded, "Friday,".  Burlingame then sent Plaintiff a "selfie" photo of her face.  When Appellant didn't respond, Burlingame wrote,

"Hmmm ok."  Realizing she was fishing for a compliment, Plaintiff replied, "Nice."

139. Not satisfied with the trite response, Burlingame upped her game to sending a photo of her rear-end in thong underwear, with a comment, "Nope that is lol," to try to get a more robust compliment, (Id).

140. Plaintiff responded, "Fo sho."  Burlingame then sent another selfie of her naked in Plaintiff's New England Patriots jersey, with the comment, "Or that lol."  Plaintiff did not respond.

141. These are a few of the documented instances of Burlingame flirting and coming on to Plaintiff.

142. They show directly the opposite of the accusations that she would make just several days later- that she was being abused, Plaintiff "had control over her," she "didn't know what to do," "he was doing anything he wanted to me."

143. These extremely serious accusations are the opposite of what these messages show.  Again, Burlingame was given every opportunity to produce and evidence in contrast to Plaintiff's evidence.

144.  She even boldly stated in her PFA complaint that (she) "have message proving everything."

145. The message she produced at the hearing stated nothing of substance- that Plaintiff asked Burlingame if she wanted to hook up and she said no she had a boyfriend, to which Plaintiff stated, "sorry I didn't know."

146. Would a criminal sexual abuser ask his victim if she wanted to link up? Such a question is not the modus operandi of an abuser with the focus on dominance and control.

147. The Facebook message string from the night of the basketball game that Burlingame did not record demonstrates that there was a breakdown in the relationship over little things at the house, not a colossal allegation that Plaintiff was abusing Burlingame, as she states in the PFA matter.

17

148. Plaintiff returned from skiing at Black Mtn. shortly after 9 pm.  The game had started sometime around 7 pm.

149. Plaintiff cooked something to eat, changed clothes and then was excited and ready to watch the Clemson game shortly after 10 pm.

150. However, when he went to his DVR he saw that there was no game there.  He checked many times and looked all over for other alternatives to find the game.  It was likely over and the ship had sailed.

151. He messaged Burlingame that she did not tape the game.  She said she did.  He said no, she had recorded the wrong channel.

152. Plaintiff told her he could not count on her for anything and they needed to talk.  She said, "wow," like Plaintiff was overreacting.

153. Plaintiff stood his ground, stating: "yeah wow."  Burlingame responded, "R u fucking kidding."

154. Plaintiff stated, "Don't come back.  Give me my car."  Burlingame responded, "No talk need (sic) ill leave."

155. Plaintiff stated that she had no respect, in response to her unapologetic reaction to his dismay in missing his game.

156. She said, "Over a fucking game".  He responded, "Nope.  It's a lot more than that," meaning that she did not help out with even little things around the house- like taping a game, did not pick up after herself sufficiently, left mounds of her dirty plates in the sink, invited whoever she wanted over without asking and was just overall disrespectful and unappreciative.

157. Burlingame then tried to turn things around on Plaintiff when she said, (but) I was fine till you couldn't fuck me anymore."  Plaintiff had a week or so before told her that he was talking to another woman in Auburn.

158. Plaintiff and Burlingame were hanging out that weekend when the new female friend called.

159.  Burlingame then teased Plaintiff that he had a new girlfriend and appeared jealous.

160.  She thereafter said she wasn't hooking up with Plaintiff if he had a girlfriend.

161.  Plaintiff responded that he did not have a girlfriend, that they were just talking.  Plaintiff also responded to Burlingame that her rationale was misinformed and her not hooking up with him under that rationale was misguided.

162.  Plaintiff responded to Burlingame's accusation that things were no longer fine now that she decided not to hook up with him anymore because he had a girlfriend, that, "That's part of it yup-guess I'm not a sucker after all," meaning she couldn't just walk all over him and use him, not even have a relationship and then to top it off, be rude and disrespectful.

163.  The fact that after almost a year from the parties' first date after matching on dating app Tinder, and all the times they had sex, that in that week or two before this argument Burlingame is saying, "till you couldn't fuck me anymore," demonstrates that the timeframe that Burlingame fabricated regarding her alleged assaults is both implausible and impossible.

164.  Burlingame went on to state, "Guess I know why you wanted me there now."

165.  Would a victim of several instances of serious sexual assault only realize that her abuser wanted her around after staying at the house the better part of almost a year since they first met, on the day that they had an argument over the taping of a game and talk of her moving out?

166.  It makes no sense and these are just another of many examples of serious lack of judgment on behalf of the lower court.

167. Burlingame then proceeded to state, "I'm not gonna fight with you I appreciate everything you did for me and ill (sic) reapect how you feel and leave," (Id).

168. Would the victim of violent sexual assaults message her abuser saying she "appreciated everything you did for me?" How in this tense moment when insults were flying back and forth would the victim not bring up being sexually assaulted? Impossible.

169. And then would the alleged abuser respond like Plaintiff did: "Maybe you'll get it someday and have respect for a man that tries to help you and not be so selfish. I hope so for your sake and stop blaming men," (Id.).

170. Would a vicious abuser say he should have been respected? No, only a person who had been taken advantage of and walked all over would say such a thing. Would an abuser state, "… stop blaming men?" Would not such a statement open up the opportunity for the alleged victim to respond either, "not all men are abusers like you," or "I have been abused by other men like you?"

171. She did not respond either way, because she was not abused by Plaintiff whatsoever. All she said was, "wow ok." The last message of that night was Plaintiff saying, " I asked so little of you and you couldn't even do that,"

172. An abuser would not have said he asked little of his victim, as abusing someone against their will would have been asking a lot of the victim.

173. The next morning at 7:20 am, Burlingame sent Appellant a rather long message saying she thought he could find the game on On Demand, (he tried, he could not). She continued about all the things she did around the house to battle the accusation that she did not pull her weight around the house.

174. Nowhere in that message did she mention anything about a requirement of a sexual nature. In fact, at the end she stated, "To

think you actually was just trying to help me out to be a nice person was stupid of me,"

175. The victim of sexual abuse would not just realize the nature of the relationship after upwards of a year in a house and living with a person there on the weekend when there was a disagreement and she was asked to leave.

176. Burlingame is bluntly admitting that the whole time she was living at Plaintiff's house she believed that he was trying to help her and that he was a "nice person." She just realized then that this was "stupid of (me)" (after the argument).

177. These voluntary statements fly in the face of her story two days later when she filed her PFA complaint alleging a long string of abuse.

178. Plaintiff responded that he did not appreciate her redecorating his house by taking down all his art and putting up music album covers, pots and pans without his permission, and trashy rugs in place of his mother's hand-woven braided rugs, (which were thrown out in the snow and froze into the ice, ruining them).

179. Burlingame responded to Plaintiff, "Don't worry when I leave ill pit (sic) it all back." Wouldn't the victim of sexual abuse be scared of her abuser in general, but many many times more after such a nasty argument? She wasn't afraid and offered to restore the house to how Plaintiff had it because she was not abused and never had any reason to fear Plaintiff.

180. Burlingame then stated that, "Pretty sure since I met you you said you didn't want a girlfriend and you don't its just am (sic) excuse for you to be a dick to me."

181. Burlingame is intimating that Plaintiff rejected her, and wasn't the desperate abuser that was chaser her for sex as she clearly alleges in her PFA complaint. Plaintiff's needing an excuse to be a "dick" to her, also does not jive with her allegation that he was abusing her. An

abuser doesn't need excuses to be mean, he presumably would just abuse the victim.

182. Plaintiff then responds, "I don't really want a gf (girlfriend)- I want someone who gives a shit about me.  And that certainly isn't you," (Id)  An abuser wouldn't expect his victim to care about him, instead he would be seeking merely to have control over the victim. Burlingame then responded, "Ok I did care neeyoud (?) hurt me too." (sic) Why would a victim of abuse say she cared about her abuser?

183. Plaintiff responded, "No no no. You DIDN'T."   She responded, "Yeah I did."  A victim of sexual abuse wouldn't care about her abuser and try to win him back, especially by safety of a text message where she could say whatever she wanted and call her alleged abuser out for all his abuse.

184. Plaintiff responded, "You care about you and you only.  I just proved that very clearly."  An abuser who abused his victim would not tell the victim she cared only about herself.  He would presumably realize that he hurt her.  She responded, "All you proved was men only see one thing."  Is she saying that all men have sexually abused her?  Of course not.

185. She is saying that all men care about sex and when she apparently decided informally (not stated or even implied) not to have it with Plaintiff, that was another strike against her.  Nothing from these statements can be construed to indicate that alleged victim had actually been the victim of abuse.  It would have been expressed in much different terms.

186. Sunday March 25, 2018 Plaintiff asked Burlingame when she would be out and that he wanted his car back in the driveway by 5 pm.  She responded she'd return the car but she'd be out when she "found a place to go," and that Plaintiff was a lawyer, he should know the laws. Plaintiff responded with a laughing emoji.  Burlingame stated, "laugh it up.  My parents have every message you sent me."

22

187. Despite this ambiguous threat, the only message Burlingame has ever produced was a message asking her if she wanted to get together back in the fall and then make cider at his parents house, and her responding, "I have a boyfriend," and Plaintiff saying sorry, he didn't know.

188. Plaintiff responded, "I'll throw everything in the snow.  You think I care? Think again."  Burlingame stated, "And ill take you to court.  I'm a legal resident."  This really pushed Plaintiff's buttons after all he had done to help Burlingame and how he was now being disrespected and having that person state that she was not going anywhere.

189. Plaintiff then said something about calling the police likely to get his car back, (the message was cut off at the top of the page).  Why would a criminal abuser call the police to get his car back from his victim when that would be an easy in for her to explain how he had been abusing her?

190. Plaintiff stated also that he had it with Burlingame and it always ends like this with every relationship she has with anyone.  He wondered why her own family wouldn't take her in, (she had said she slept in the car the night before).  "You don't sense a pattern or problem here?"

191. Plaintiff went on to state that Burlingame had until tomorrow, (Monday March 26, 2018) to have her stuff out, then he was changing the locks and issuing a no trespass order to her.  That afternoon when Plaintiff was skiing, Burlingame went back to the house and put a lock on the outside of her bedroom door to stop Plaintiff from making good on his threat to go in the room and throw her stuff out.

192. She the next day in her complaint would falsely state that many weeks before that day she had gone out and bought a lock to put on her room so that Plaintiff could not sexually abuse her.  In fact, however, it was Plaintiff's former roommate James Adinolfi who had bought the lock and latch and left it behind when he moved out.

23

193. The parties then argued about the car that Plaintiff got fixed so Burlingame could have a car to get a job.  Burlingame then first accused Plaintiff of taking the car back "because I won't sleep with you."   Apparently, that is when her PFA scheme was hatched.  Plaintiff responded, "Stop saying that."

194. If he had been a sexual abuser he wouldn't have told her not to say that.  Burlingame stated, "It's called sexual harassment."  Plaintiff, not knowing what specifically the allegation Burlingame was intimating, (because he never committed any sexual impropriety) corrected Burlingame that sexual harassment occurred in the workplace.

195. As Plaintiff tried to prove at trial but was improperly prevented from doing so, alleged victim knows the PFA process and tenancy laws well and she used that knowledge to concoct a plan to stay in Plaintiff's home when he had told her to leave.

196. A short time after the trial in this matter, Plaintiff received proof of alleged victim's scheme to stay in the home from his neighbor who the neighbor says alleged victim was trying to sleep with.

197. The neighbor called Plaintiff the morning of March 26, 2018 and told him that Ms. Burlingame had told him that she was being told to leave Plaintiff's house but she knew how to stop the eviction: she told him that if she filed a PFA she would not have to leave, and Plaintiff, not her, would be removed from the home.

198. In her message to the neighbor, on March 26, 8:40 am, alleged victim states that she is getting a PFA on Plaintiff, "Because he is gonna throw my stuff outside at noon."

199. Alleged victim when asked where she will go, she states, "There" and that "he will be made to leave."

200. This intimate knowledge of the PFA process and tenancy laws shows alleged victim's plan/scheme to defraud the court by falsely accusing Plaintiff of abuse.

24

201. Ms. Burlingame also says to the neighbor, "Lmao," ("laughing my ass off") "I can't wait." "I told him I wasn't one to mess with." This portion of the messages shows fake victim's intent was to hurt Appellant because she was asked to leave and thus rejected, (which is the trigger for sociopaths like fake victim).

202. This evidence demonstrates that alleged victim fabricated her claims in her PFA complaint in order to stay in Plaintiff's home when he had asked her to leave.

203. Defendant Rumford Police Dept. has been harassing and discriminating against Plaintiff for years.

204. They have recklessly and negligently charged him with over a dozen crimes, including several felonies in several matters.

205. In or about 2008 when he owned a company attempting to bring a casino to Rumford, he was falsely charged with harassment.

206. The charge was dropped later by the DA, but a member of the RPD had allegedly told his spouse and she leaked it to the media and it was front page news.

207. This is just one example of the many false arrests and charges Plaintiff has had to face over the last two decades since he dared to challenge the propriety of Defendant RPD.

208. Ever since Plaintiff co-founded a local town private group called Concerned Citizens for Fiscal Responsibility to question the need for million and now two million dollar police, fire and other departments in a poor blue collar town of less than 6000 people.

209. RPD's discrimination has been well-documented, in multiple letters to multiple chief of police and town managers. It has never ceased and never relented.

210. The RPD's treatment has made it tough to live peaceably in his home town where he is a fourth generation resident.

211. There is much more to this story which will be explained to the jury.

## COUNT I:
## VIOLATION OF 4TH AMENDMENT TO THE MAINE AND U.S. CONSTITUTIONS

212. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 211 of this Complaint.

213. Defendants intentionally detained and jailed Mr. Carey in violation of his constitutional right to be free from unreasonable seizures, as guaranteed by the Fourth Amendment to the Maine and United States Constitutions.

214. Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.

215. Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.

216. Defendants' conduct violated clearly established constitutional or other rights of which Defendants knew, or of which a reasonable public official should have known.

217. Defendants' actions, omissions, policies, patterns, practices, and customs, as complained of herein, were intentional and reckless and demonstrate a callous disregard for, or deliberate indifference to, Mr. Carey's personal safety, security, freedom, and civil and constitutional rights.

218. These violations are compensable under state and U.S. law.  As a direct and proximate result of the unlawful actions of Defendant, Mr. Carey has suffered damage to his professional career and reputation, economic damages and significant physical and emotional harm.

## COUNT II:
## VIOLATION OF 5TH AMENDMENT TO THE MAINE AND U.S. CONSTITUTIONS/DUE PROCESS CLAUSES

219. Plaintiff realleges and incorporates herein by reference each and every

220. allegation contained in paragraphs 1 through 218 of this Complaint.

221. Defendants' public officials are charged with being professional, accommodating, and treating members of the public and especially the taxpaying citizens with dignity and respect.

222. Defendants' willful acts towards Mr. Carey constitute disgraceful conduct insofar as they were intended to cause Mr. Carey to be subjected to the indignities articulated herein.

223. Defendants intended to cause Mr. Carey emotional distress, and/or acted in reckless disregard of the likelihood of causing Mr. Carey emotional distress, in committing these acts.

224. Defendants' employees and agents were acting within the scope of their employment when they committed these acts.

225. As a direct and proximate result of Defendant's acts, Mr. Carey suffered and continues to suffer severe mental anguish and emotional and physical distress.

226. Mr. Carey has incurred and continues to incur medical expenses and other damages in an amount to be proven at trial.

## COUNT III:
## VIOLATION OF 5TH AND 14TH AMENDMENTS TO THE MAINE AND U.S. CONSTITUTIONS (42 U.S.C. § 1983)

227. Plaintiff realleges and incorporates herein by reference each and every

228. allegation contained in paragraphs 1 through 226 of this Complaint.

229. Defendants deprived Mr. Carey of his constitutional right to liberty and deprived him of this liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United

States Constitution by causing and/or participating in the illegal, arbitrary, and capricious arrest and jailing of Mr. Carey.

230. Defendants caused and/or participated in the harassment of Mr. Carey without reasonable basis or lawful authority.

231. Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.

232. The conduct of Defendants violated clearly established constitutional or other rights, of which Defendants knew, or of which a reasonable public official should have known.

233. The actions, omissions, policies, patterns, practices and customs of

234. Defendants, complained of herein, were intentional, reckless, and show a

235. callous disregard for, or deliberate indifference to Mr. Carey's personal safety, security, freedom, and civil and constitutional rights.

236. These violations are compensable pursuant to U.S.C. § 1983. As a

237. direct and proximate result of these Defendants' conduct, Mr. Carey has suffered economic damages and significant physical and emotional harm.

## COUNT IV:
## VIOLATION OF 14ᵀᴴ AMENDMENT TO THE MAINE & U.S. CONSTITUTIONS
### (42 U.S.C. § 1983)

238. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 237 of this Complaint.

239. Defendants deliberately and unconstitutionally discriminated against Mr. Carey so as to deny him equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution and his liberty by causing or participating in his harassment and sponsorship of false accusations.

240.  Defendants acted under color of law and acted or purported to act in the performance of official duties under federal, state, county, or municipal laws, ordinances, or regulations.  Defendant acted with the intent or purpose to discriminate against Mr. Carey.

241.  The conduct of these Defendants violated clearly established constitutional or other rights, of which Defendants knew, or of which a reasonable public official should have known.

242.  The acts, omissions, policies, patterns, practices, and customs of these Defendants complained of herein were intentional, reckless, and show a callous

243.  disregard for, or deliberate indifference to Mr. Carey's privacy, security, freedom, and civil and constitutional rights.

244.  These violations are compensable pursuant to U.S.C. § 1983. As a direct and proximate result of these Defendants' conduct, Mr. Carey has suffered economic damages and significant physical and emotional harm.

## COUNT V:
## NEGLIGENCE/ABUSE OF PROCESS

245.  Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 244 of this Complaint.

246.  Defendants breached their duty of reasonable care by negligently acting or omitting to act in such a way that resulted in the false imprisonment of Mr. Carey, defamatory false criminal charges and the ruination of his career, which Defendant knew or should have known was immoral and wrongful.

247.  Defendants were negligent in performing their duties and failed, neglected and/or refused to properly and fully discharge their responsibilities by, among other things:

- Creating and/or sanctioning illegal policies, patterns, practices;

- Failing to adequately train and supervise personnel and
- Defendants charged with safeguarding the welfare of citizens in citizen-                owned public buildings; and
- Arresting, jailing and charging Plaintiff under false pretenses with no probable cause or credible accusation.

248. Defendants were acting within the scope of their employment when they committed these acts.

249. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT VI:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

250. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 249 of this Complaint.

251. Defendants' willful acts constitute outrageous conduct insofar as they were intended to cause ruination of Plaintiff's career and reputation.

252. Defendants' intent to cause Mr. Carey emotional distress, and/or acted in reckless disregard of the probability of causing Mr. Carey emotional distress in committing these acts.

253. Plaintiff has been in therapy and under a psychiatrists care since Defendant's actions led to his mental anguish and distress.

254. As a direct and proximate result of the actions of Defendants, Mr. Carey suffered and continues to suffer economic damages, severe mental anguish, and emotional and physical distress.

## COUNT VII:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

255. Plaintiff re-alleges and incorporates by reference the above facts of the Complaint as if set forth fully herein

256. Defendants negligently inflicted emotional distress on Plaintiff through their abusive actions.

257. Plaintiff's career and reputation have been ruined by Defendants' negligent actions.

258. Plaintiff's mistreatment caused him great distress. The actions caused harm that would reasonably be expected to befall the ordinary sensitive person.

259. Defendants' conduct caused the negligent infliction of emotional distress to Plaintiff and they are thus liable.

## COUNT VIII:
## DEFAMATION & FALSE LIGHT

260. Plaintiff realleges and incorporates herein by reference each and every
261. allegation contained in paragraphs 1 through 259of this Complaint.

262. Defendants' misguided and negligent investigation of Plaintiff caused the news coverage embarrassment that stems from being a professional respected attorney running for district attorney then being jailed and accused of being a violent sex predator.

263. Defendants defamed Plaintiff when they misstated to the news media for wide dissemination that Plaintiff was a serious criminal that took years of investigation to prove their case in order to arrest him across the country.

264. In actuality, he had committed no crime whatsoever and it was obvious to everyone.

265. Plaintiff as a public figure running for DA, in addition to negligence needs to show malice, which under these facts is easily done.

266. The damage to Plaintiff's reputation he has suffered at the hands of the Defendants is tremendous and Plaintiff seeks full compensation.

## COUNT IX:
## NEGLIGENT HIRING

267. Plaintiff realleges and incorporates herein by reference each and every

268. allegation contained in paragraphs 1 through 266 of this Complaint.

269. The Defendants hired incompetent reckless "super cops" Daniel Garbarini, who could not even complete one year of college.

270. Plaintiff grew up with Garbarini as his neighbor and his brother a best friend. Plaintiff thus knows the immorality and disrespect for law that Garbarini has at his core.

271. Garbarini now makes over $100,000 per year to act as a corrupt cop.

272. Chavez is somewhat more bright than his counterpart, yet more sinister and dangerous to the innocent citizens of Maine who could be locked up at the whim of this power-hungry peculiar fellow.

273. The MSP and Rumford Police Department are both liable for negligent hiring and training of Detective Garbarini and Detective Chavez, as they clearly do not understand basic constitutional rights of the citizens they are hired to protect and serve.

274. Defendants had no right to conduct a scam investigation which any logical person would see the facts and know this was a joke.

275. Also, Granger DA had an opportunity to 86 this sham prosecution of Plaintiff.

276. Plaintiff requested that he did and he had the opportunity to do so, which he declined.

277. Plaintiff has a constitutional right to be free from the unlawful sham investigation and prosecution afforded by the fourth amendment to the constitution.

278. The Defendants should never have hired Defendant Garbarini and Chavez, who mistreated and falsely accused Plaintiff of serious felonies and laughed off charging the real criminal, Ms. Burlingame.

279. The Defendants named herein clearly would not have been hired if the hiring officials knew that their hires would trample the basic dignities and rights of citizens and expose them to significant legal liability.

280. Therefore, supervising Defendants are liable for negligent hiring.

## COUNT X:
## NEGLIGENT SUPERVISION & TRAINING

281. Plaintiff realleges and incorporates herein by reference each and every

282. allegation contained in paragraphs 1 through 280 of this Complaint.

283. Supervising Defendants, including the District Attorney's Office, Police Department, MSP Captain and Police Chief are all liable for their negligent supervision and training.

284. Scrupulous law-abiding law enforcement agencies would train their employees in the basic tenants of not allowing for the blatant mistreatment of a person as Mr. Carey was.

285. Unfortunately, the supervisors herein did not properly train or supervise their employees and that led to the outrageous behavior and treatment of a law-abiding citizen as outlined herein.

286. Defendants are therefore liable for their negligent supervision and training.

## COUNT XI:
## MAINE UNFAIR TRADE PRACTICES ACT

287. Plaintiff re-alleges and incorporates by reference the above facts of the Complaint as if set forth fully herein.

288. Under the provisions of the Maine Unfair Trade Practices Act, 5 M.R.S.A.§ 213, Plaintiff through his counsel made written demand for relief as outlined in that statute.

289. The Defendants were informed that their actions in this matter violated the Maine Unfair Trade Practices Act, 5 M.R.S.A.§ 207.

290.  As a result of this unfair and deceptive act and practice, claimant suffered injury or loss of money or property as follows: he was embarrassed, mentally abused, defamed, his career was ruined ridiculed, and other expenses.

## COUNT XII:
## INVASION OF PRIVACY

291.  Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

292.  By invading Plaintiff's privacy in arresting him in dramatic traumatizing fashion, and performing press conferences and releases singing their own praises for stopping this huge criminal, Defendants are liable for invasion of privacy.

293.  This invasion violated a bevy of Plaintiff's constitutional rights as outlined supra and would be highly offensive to a reasonable person.

294.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial.

295.  Defendants did not engage in their conduct out of any sincere or proper motive, but did so knowingly, willfully and oppressively, with full knowledge of the adverse effects that their actions would have on Plaintiff, and with willful and deliberate disregard for these consequences. Accordingly, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## COUNT XIII:
## FALSE LIGHT

296.  Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

297.  Through the intentional defamation of Plaintiff by Defendants, including writing sensationalized defamatory press releases, Defendants portrayed Plaintiff in a false light.

298.  Defendants actions were knowing and intentional and led to the majority of the citizens of Maine seeing Plaintiff in a negative false light.

299.  Such an appearance is devastating to a public person running for a serious office such as top law enforcement official in three counties and having a private law practice on top of that.

300.  Defendants are therefore liable for the tort of false light.

## COUNT IXX:
## FRAUD

301.  Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

302.  By intentionally defaming Plaintiff to the public, as a potential public official who actually would have likely won his race and been district attorney, Defendants have all committed the serious civil and criminal action of fraud.

303.  Defendants are therefore all liable for fraud.

## COUNT XXI:
## FALSE IMPRISONMENT

304.  Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

305.  Plaintiff was falsely intentionally arrested and jailed in a scary claustrophobic prison filled with actual real dangerous and scary criminals.

306.  Plaintiff will never forget the first night in the prison with two criminals when the guards locked the airtight doors.

307. Plaintiff struggled to breathe and was gasping for air having a panic attack.

308. This was during the pandemic, so to make matters worse, the prisoners were only allowed to leave their cells for one hour to shower and eat.

309. The ultra processed chemicals that passed for "food" made Plaintiff so sick that he could not have a bowel movement for the entire time in jail and several days after.

310. Once he could have one, the pressure from constipation was so severe that he burst blood vessels that led to him getting hemorrhoids, which he still currently suffers from and will for life.

311. The false imprisonment of Plaintiff was serious and damaging mentally and physically and Defendants must pay for their despicable actions.

## COUNT XXII:
## MALICIOUS PROSECUTION

312. Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

313. Falsely arresting and imprisoning Plaintiff was bad enough.

314. However, Defendants' corruption knows no limits.

315. Plaintiff was then maliciously prosecuted for these fake crimes.

316. Plaintiff suffered day and night for over a year while he was being prosecuted and could have spent over a decade in jail based on obvious false charges.

317. Defendants are liable for malicious prosecution.

## COUNT XXIII:
## PERSONAL INJURY

318.  Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

319.  Plaintiff was falsely arrested by the US Marshalls at Defendants' direction.

320.  He was thrown in jail for ten days and given only a bit of food not fit for an animal.

321.  The ultra-processed garbage Frankenfood had zero fiber and so Plaintiff was not able to have a bowel movement for all his time in jail and afterwards for days.

322.  When he finally was able to go to the bathroom, it was so painful and popped so many blood vessels that he developed hemorrhoids.

323.  This is a life-long medical condition that Plaintiff will have for life and never would have gotten, as he eats extremely healthy.


## COUNT IXX:
## INJUNCTION TO ENFORCE CRIMINAL SPEEDING LAWS

324.  Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

325.  As outlined herein, Defendant RPD refuses to enforce the speeding laws in the neighborhood where Plaintiff lives.

326.  Plaintiff has requested ad naseum that these laws be enforced.

327.  The RPD has refused to patrol the speeding in Rumford Point with any sort of regularity.

328.  As a result, criminal speeders treat Route 2 like Taladega Raceway.

## COUNT XXX:
## REQUEST FOR DECLARATORY INJUNCTIVE RELIEF TO CEASE HARASSMENT

329.  Plaintiff realleges and incorporates by this reference the allegations contained above, inclusive, as though they were fully set forth herein.

330.  Despite being warned by Plaintiff that Defendants are violating his constitutional rights of privacy, they have continually harassed him for years since his false arrest in 2021, and long before that for publicly challenging their bloated budget.

331.  Plaintiff has a right to be left alone and he seeks a declaratory judgment and injunction in that regard.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants, and each of them, as follows:

1.  For general damages against the Defendants, jointly and severally, in an amount to be proven at trial in excess of $1,000,000;

2.  For special damages against the Defendants, jointly and severally, in an amount to be proven at trial;

3.  For consequential damages against all Defendants, jointly and severally, for the loss of income for seven years of the average family law, criminal law, personal injury, civil, appeals, bankruptcy, social security and workers' compensation attorneys in Maine in eight of their prime earning years or their 40s after 15 years experience.

4.  For significant punitive and exemplary damages against the Defendants, jointly and severally, in an amount to be proven at trial in excess of $1,000,000;

5.  For reasonable costs, expenses, and attorneys' fees pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794a, and any other applicable state and federal law;

6.  For injunctive relief against Defendants, requiring Defendants to promulgate safeguards and policies as set forth herein and to adequately train and supervise employees in order to safeguard the rights of law abiding citizens;

7. For the release of the complete grand jury transcripts and audio files in the criminal case against Plaintiff and all other communications between the Defendants and their agents and associates;

8. Enter judgment declaring that the policies and practices of the Defendants as described in this Complaint violated the rights of Plaintiff, and Defendants must apologize and admit their wrongdoing in an advertisement in all newspapers that covered Plaintiff's mistreatment; and

9.  For such other relief as the Court deems just, equitable and proper.

**JURY TRIAL**

Plaintiff demands a jury trial on all issues so triable.

Dated at Rumford, Maine this 20th day of July, 2025.


/s/ Seth Carey

_____
Seth T. Carey, Plaintiff
1746 US 2
Rumford, ME 04276